**Walter JOHNSON, Surviving Spouse of Gloria H. Johnson, Deceased, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner, Social Security Admin., Defendant.**

No. CIV.A. H–02–2657.

United States District Court, S.D. Texas, Houston Division.

March 18, 2003.

Victor N. Makris, Attorney at Law, Bellaire, TX, for plaintiff.

Kim Elizabeth Garcia, Social Security Administration, Office of the General Counsel, Dallas, TX, for defendant.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

This Social Security Act appeal was referred to Magistrate Judge Calvin Botley pursuant to 28 U.S.C. §§ 636(b)(1)(B). On February 15, 2003, Magistrate Judge Botley issued a Memorandum and Recommendations [Doc. # 15]. Subsequently, on February 24, 2003, Magistrate Judge Botley issued an Amended Memorandum and

Recommendations [Doc. # 16], suggesting that this Court deny Defendant's Motion for Summary Judgment [Doc. # 12], grant Plaintiff's Motion for Summary Judgment [Doc. # 10], and remand this action to the Defendant Commissioner pursuant to "sentence four" of section 405(g) to consider mental capacity evidence for Plaintiff (decedent) and, if necessary, additional vocational evidence. The time for objections to be filed by the parties about the Amended Memorandum and Recommendations has expired without any objections having been filed. The Court finds that the Magistrate Judge's Amended Memorandum and Recommendation is well founded, and that the Magistrate Judge's recommended dispositions should be adopted.[1] It is therefore

**ORDERED** that the **Amended Memorandum and Recommendations** [Doc. # 16] is **adopted** as this Court's Memorandum and Order. It is further

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 12] is **DENIED.** It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 10] is **GRANTED.** It is further

**ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Commissioner pursuant to "sentence four" of section 405(g), to consider mental capacity evidence for Gloria Johnson.

1. Since there are no objections, the Court has not made a *de novo* review of this matter.

1. Plaintiff's Motion for Summary Judgment (Entry # 10) and Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (Entry # 11) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Entry # 14) will be referred to henceforth as the single instrument,

# AMENDED MEMORANDUM AND RECOMMENDATIONS

BOTLEY, United States Magistrate Judge.

Plaintiff Walter Johnson ("Johnson"), surviving spouse of Gloria H. Johnson (hereinafter referred to as "the decedent"), seeks judicial review of the Social Security Administration's ("SSA") denial of his deceased wife's claim for social security disability benefits provided by Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* *See* Plaintiff's Motion for Summary Judgment (Entry # 10) and Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (Entry # 11).[1] Defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner") urges her decision denying Gloria Johnson's claim for benefits be upheld and maintains that Gloria Johnson was not disabled as she was capable of performing certain limited light work, and that such work exists in significant numbers in the national economy. *See* Defendant's Motion for Summary Judgment (Entry # 12) and Memorandum in Support of Defendant's Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (Entry # 13).[2] Johnson contends that the record lacked a mental residual functional capacity (RFC) assessment from a qualified examining or non-examining source and that the administrative law judge ("ALJ") erred by failing to consult with a psychiatric or psychological

"Plaintiff's Motion for Summary Judgment (Entry # 10)."

2. Defendant's Motion for Summary Judgment (Entry # 12) and Memorandum of in Support of Defendant's Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (Entry # 13) will be referred to henceforth as Defendant's Motion for Summary Judgment (Entry # 12).

medical expert regarding the decedent's mental residual functional capacity. Johnson further contends that the ALJ erred by relying on vocational expert testimony regarding other work that the decedent could perform because the vocational expert's testimony was in conflict with the *Dictionary of Occupational Titles* (DOT) and violated Social Security Ruling (SSR) 00–04p. Johnson maintains that the Commissioner's decision should be reversed or remanded, contending that it contains an error of law, is not predicated upon substantial evidence and does not comply with applicable legal standards.

Conversely, the Commissioner contends that her finding that the decedent was not disabled is based upon a complete review of the claimant's medical records as well as the opinions of her treating physicians and those of the vocational and consulting medical experts and, accordingly, the reaffirmation of the ALJ's decision that the decedent is not disabled because she retains the residual functional capacity (RFC) to perform certain limited light work, is premised upon substantial evidence and the proper application of the relevant legal standards.

## THE FACTUAL AND PROCEDURAL BACK GROUND

### *The Pertinent Factual Background— The Medical History and Alleged Impairments*

Gloria Johnson was forty six (46) years old at the time of the administrative hearing on June 14, 1999. She had a ninth grade education and past work experience as a housekeeper in a hospital. (R. 19).[3] The record indicates that Gloria Johnson died on March 14, 2001 (R. 8) and that her husband, Walter Johnson, is suing as a substitute party on her behalf.

The record indicates that, in 1992, the decedent was hospitalized for psychiatric treatment at Belle Park Hospital in Houston, Texas. The sole record from Belle Park Hospital contained in the record is a one page "Discharge/Aftercare Plans" summary, dated December 16, 1992, and signed by nurse A. Flores. (R. 156). This one page record recommends a "psychiatric" follow-up appointment with Michael Thomas on December 17, 1991, return for aftercare, including support groups, return to work on January 15, 1993, continued teaching of more effective coping and taking Prozac 20 mg daily. The record does not contain any admission records, chart notes, reports of treating psychiatrists or any other records from Belle Park Hospital.

The record contains medical records from Dr. Joshua Michael Gold, the decedent's regular treating physician. The records span the dates from August 1, 1995 to July 15, 1998 and the copies are of poor quality and largely illegible; however, progress notes indicate that the decedent was "depressed" and prescribed Zoloft 80 mg on August 1, 1995 (R. 212), and that she remained "stressed out" and "tense" with "job stress" and "no help [from] Zoloft" on August 31, 1995. (R. 212). Progress notes, dated February 26, 1996, indicate the decedent continued to be depressed with anorexia and weight loss of twenty five pounds and that her "job is depressing." (R. 211). Notes of a check up on January 20, 1997, indicate a loss of appetite for two weeks. (R. 194). A progress note, dated January 12, 1998, indicates that the decedent was given Wellbut-

---

**3.** References made to statements taken from that portion of the administrative record identified as the "transcript" of the administrative hearing are designated "T," followed by the applicable page number(s) of the record; and, references made to items contained in the remainder of the record are designated "R," followed by the applicable page number(s).

rin 150 # 40. (R. 177). An undated note appearing between progress notes, dated January 12, 1998 and February 5, 1998, states Gloria Johnson's age as forty-four (44) and that she was having suicidal thoughts the previous week including running out in the freeway and taking an overdose of pills. The same note indicates she is stressed and hates herself because she "can't work or do anything that makes her happy" and was tearful "AOx3." Gloria Johnson was diagnosed with depression and it appears that her dosage of Zoloft was raised "TID" and Effexor 75 mg QD was prescribed in divided doses. (R. 176). A progress note, dated June 18, 1998, mentions Effexor 75 mg. (R. 172). A progress note, dated July 15, 1998, indicates "D/C Effexor" and "Wellbutrin SR 150 # 44." The same progress note also mentions Prozac, but there is no mention of Zoloft. (R. 171).

Interviewer P. Francis prepared a Social Security Administration Disability Report with respect to the decedent's claim on July 7, 1998. Francis made the following observations about her interview with the decedent:

> This was a difficult interview. She's a nice lady but easily confused. It took at least 20 minutes to find out when she stopped working, when she was hurt and even how much she got. It wasn't a mental problem, it was understanding what is said to her. I think it may be more of an education limitation rather than depression (personal observation). (R. 143).

The record contains a report of an examination of the decedent by psychiatrist Charles B. Covert with respect to "allegations of disability due to depression." The date of the examination referred to in the report is August 27, 1998. The report is addressed to the Disability Determination Service, Texas Rehabilitation Commission. In the report, Dr. Covert indicates that Gloria Johnson was psychiatrically hospitalized on one occasion in 1992 for approximately eighteen days and, thereafter, was treated with antidepressants and received outpatient care. There is no indication that Dr. Covert reviewed the psychiatric hospital records. Dr. Covert does, however, state that Gloria Johnson continues with Zoloft, 50 mg, three times daily prescribed by her family doctor and sees her general physician monthly to have her Zoloft prescription refilled. Despite the fact that Dr. Gold's records indicate that Gloria Johnson had been prescribed and/or was taking Wellbutrin and Effexor shortly before her examination by Dr. Covert (R. 171), Dr. Covert does not discuss Wellbutrin in his report and only discusses Effexor as something Gloria Johnson has taken in the past. Further, Dr. Covert's report does not mention or address the decedent's suicidal ideations or diagnosis of depression earlier that same year as reported in Dr. Gold's records. Covert simply does not specify in his report which of the decedent's medical records he has reviewed. The sole reference to any review of records or any past psychiatric diagnosis is a mention of a one page undated, unsigned progress note from an unspecified source, to which Dr. Covert accords "limited benefit," indicating that "at some point in the past, [Gloria Johnson] apparently had depressive symptoms ... and was upset at not being able to work. She was receiving Zoloft in unknown amounts three times daily, as well as, Effexor, 75 mg, daily in divided doses." (R. 215). There is no specific mention of Dr. Gold or the decedent's therapist, Michael Thomas. Despite what appears from his report to be a superficial and incomplete evaluation and analysis of the decedent's psychiatric history and condition, Dr. Covert diagnosed the decedent as suffering from a "adjustment disorder with depressed mood, was mild, is now stabilized and im-

proved on appropriate treatment." Dr. Covert further indicated that the decedent's psychiatric prognosis is excellent and gave her a current GAF score of 75.[4] (R. 215–216).

The record contains a Psychiatric Review Technique Form ("PRTF") of Gloria Johnson prepared by psychiatrist Richard J. Alexander on September 14, 1998 and reviewed by psychologist N.R. Curtis on November 24, 1998. In it, Dr. Alexander indicates that Gloria Johnson's impairment (Category 12.04 Affective Disorders) is not severe and no RFC Assessment is necessary. (R. 218). The PRTF indicates in the Reviewer's Notes:

> ["M]emory/concentration intact. No evidence of psychosis. Oriented in all spheres. Insight, judgment, intellect all deemed average. No limitations are recognized with regards to concentration, persistence and pace or social functioning. Client is able to attend to personal/ADLs. Hindered only by physical condition.... Although client's functioning is nonsevere, MRFC will be given in light of past possible suicide attempt/ideation. Claimant is credible." (R. 219).

Dr. Alexander's conclusion mirrored that of Dr. Covert; i.e., that the decedent had an adjustment disorder with depressed mood. He further found the decedent's restriction of activities of daily living to be slight, that she had no difficulties in maintaining social functioning, that her deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner were seldom, and that she never had episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from the situation or to experience exacerbation of signs and symptoms, which may include deterioration of adaptive behaviors. (R. 225). As such, Dr. Alexander found the decedent to have zero functional limitations manifested at the degree of limitation that satisfies the listings. (R. 225).

The record contains a Current Mental Status Examination ("CMSE") of Gloria Johnson, dated November 11, 1998, and prepared by Michael J. Thomas, LMSW–ACP, of the Greater Houston Psychotherapy Consulting Firm, Gloria Johnson's treating therapist (hereinafter "Thomas"). According to Gloria Johnson's testimony at the ALJ hearing, the decedent treated with Thomas for eight or nine years, ever since her eighteen-day psychiatric hospitalization. (T. 45). Her referral to Thomas for post-hospitalization follow-up psychiatric care is evidenced in the Discharge Summary from Belle Park Hospital. (R. 156). In the CMSE, Thomas indicates a past history of depression and suicidal feelings and specifies that Gloria Johnson's mood is depressed and her affect sad, and that she has feelings of being victimized and persecuted. He further notes that her concentration, judgment, ability to relate to others and to sustain work and respond to change/stress in a work setting is poor. (R. 234–235).

---

4. A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 30 (4th ed. 1994) ("DSM–IV"). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. An individual with a GAF of 75 may not experience symptoms. If present, the symptoms will be "transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning ...." *Id.*

On February 3, 1999 the Social Security Administration found that Gloria Johnson had "good cause" for the late filing of her request for a hearing before an administrative law judge. In finding that good cause for the late filing existed, the agency found that Gloria Johnson "is undergoing psychiatric treatments for suicidal attempts and also for trying to kill her husband. She also suffers from severe depression. She is very forgetful and is easily confused.... Due to [Gloria Johnson's] disability, I don't see how she could file an appeal without assistance-she is not capable of filing on time." (R. 100).

The record contains another report from Thomas, dated March 2, 1999. In this report, Thomas diagnosed Gloria Johnson as suffering from a major affective disorder and severe depression, suicidal ideation and loss of employment, self esteem and self worth. The report states that Gloria Johnson initially presented with symptoms of depression, exhibiting feelings of low self-esteem and self-worth, and that such feelings have increased dramatically since she left her employment on disability. Thomas opines that depression is more the culprit versus the loss of employment, and further states that Gloria Johnson's social support network is eroding, her marital problems are at an all time high, she is more and more isolated from parents and siblings and her relationship with her four adult children is becoming increasingly strained. (R. 248–249).

Dr. Lloyd C. Jones, board certified in internal medicine, provided the only medical testimony at the hearing before the ALJ. (T. 62). Dr. Jones did not treat or examine Gloria Johnson. (T. 62). Dr. Jones' sole mention of Gloria Johnson's mental disorder is as follows:

Q Please summarize the objective medical evidence as far as the *physical* are concerned and please state your opinion as to the severity.

A The lady's medical records indicate ... she has a history of an adjustment disorder with depressed mood stabilize [*sic*], documented by Exhibit 5F, page two versus a major depressive disorder documented by Exhibit 11F, page two, placed under the listing of 12.04, which is considered to be a severe disorder again according to the definition of Social Security.

. . . .

Q Doctor, are you familiar with what Social Security calls a listing of impairments?

A I am, Your Honor.

Q In your opinion, does she meet or equal any set listings when taken individually or together?

A No sir, she does not meet or equal either singularly or in combination.

Q In your opinion, since she doesn't meet or equal, what type of residual functional capacity would you place upon her as far as sitting, standing, walking, carrying, and so on like from a *physical side?*

A ... If I take without consideration of her subjective symptomatology [*sic*], she should be able to perform in a light work category as defined by the secretary and restrictions upon that would be a low stress environment. If I take into consideration her subjective symptoms that would be reduced to sedentary work as defined by the secretary. (T. 64, Emphasis Added).

Despite her psychological impairments, there was no expert testimony offered at the ALJ hearing with regard to the decedent's mental residual functional capacity.

The sole vocational expert testimony at the ALJ hearing was provided by Ted Jolly. Pertinent testimony is as follows:

Q Now, based on her age, education, past work experience, assume my finding she has to alternate between the sitting and standing, lift no more than 10 pounds at a time, further restrictions of no heights or climbing, no moving or dangerous equipment, no repetitive wrist movements, no exposures to chemicals as far as the hands are concerned, low stress, limited dealing with the public, could she do her past relevant work?

A No, sir.

Q Could you give me three examples of other unskilled occupations in that hypothetical, please?

A ... I'm not able to give a job. There would be no jobs.

Q Well, I'll say I'll bump it up to light lifting up to 20 pounds occasionally, 10 pounds frequently, what would be your response? Can you give me three there?

. . . .

A Load supply builder.

. . . .

A ... Mail clerk.

Q How about a surveillance monitor? Is that an unskilled?

A No. That's not skilled. That's unskilled and would be primarily a government job.

Q She's just to sit there and watch the monitors.

A Yes, sir.

Q Surveillance systems monitor?

A That would be sedentary. Yes, sir. *And it would highly involve risk.*

Q So she could do that at sedentary?

A Yes, sir. That is a sedentary job. That has no public contact, has no use of the wrist, and no chemicals. Though it would be—

Q So, you do have one?

A One sedentary job that would meet the limitations.

Q What would be the numbers on that?

A In Houston, it would be—maximum would be about 125.

Q 125 what?

A Jobs in Houston.

. . . .

Q That's in all the office buildings.

A Well, there are other surveillance jobs, too, that are security. But, so many of them when you are surveillance, you also are required to go through a site and investigate and leave the monitor. And so, many of them are called surveillance system monitor, but the problem is—also in a facility where they have housing for prisoners, they have surveillance system monitor. But, those people are required when there's a disturbance to respond to disturbance and walk the perimeter. So, it becomes a light job and not a sedentary job. And so, the ones that are strictly sedentary that I've been able to determine are fairly limited.

Q All right. How many nationally?

A Nationally, that would be between 10 and 15,000.

(T. 78–80, Emphasis Added).

A second PRTF was completed by the ALJ on July 23, 1999. The ALJ's PRTF indicated the necessity of a residual functional capacity assessment based upon category 12.04, Affective Disorders. In determining whether the decedent met listing 12.04, Affective Disorders, the ALJ indicated that evidence of depressive syndrome was absent, despite evidence in the record that she suffered from persistent depression and at least four of the factors to be considered; e.g., appetite disturbance with change in weight; feelings of

guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide. The PRTF does, however, indicate a presence of adjustment disorder with depressed mood and specifies that the decedent has slight restrictions of activities of daily living; slight difficulties in maintaining social functioning; often has deficiencies of concentration; persistence or pace resulting in a failure to complete tasks in a timely manner (in work settings or elsewhere); and has "once/twice" had episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms, which may include deterioration of adaptive behaviors. Nevertheless, the PRTF indicates a finding of zero functional limitations manifested at the listing level. (T. 27–29).

### The Procedural Background—The Administrative Proceedings and Exhaustion of Administrative Remedies

Gloria Johnson protectively filed an application for social security disability benefits on June 16, 1998 (R. 18), seeking disability benefits due to an inability to work as a consequence of alleged severe hand rash and carpal tunnel problems. (R. 113). It appears from the record that the decedent first alleged a mental disability in her Reconsideration and Disability Report, dated September 25, 1998. (R. 150). Following an agency denial of the claim for benefits, an administrative hearing was held on June 14, 1999, at which the decedent was represented by an attorney. (R. 33). The ALJ, on July 23, 1999, denied the decedent's request for benefits after finding that she was not disabled and was capable of performing limited light work. (R. 25–26). The ALJ found that the decedent had severe bilateral carpal tunnel syndrome, a herniated disc with mild spondylosis, chronic dermatitis and depression. The ALJ determined that these impairments did not singly or in combination meet or equal a Listed Impairment in 20 C.F.R. Part 404, Subpart P, Appendix I, and that the decedent was not under a disability as defined by the Social Security Act. (T. 25–26). The ALJ further found that the decedent could not perform her past relevant work as a housekeeper in a hospital (T. 26); however, she did retain the ability to perform work at a light level of physical exertion, limited by the need to alternate sitting and standing at will, in a low stress work environment with limited contact with the public, and avoid jobs that require climbing or work at significant, unprotected heights and around moving or dangerous equipment, repetitive wrist movements, and exposure of her hands to chemicals. (T. 23, 25). The ALJ specifically found that the decedent's mental limitations do require "a reduction in the residual functional capacity to work which is in a low stress work environment with limited public contact." (T. 23). The ALJ further found that limited light work which the decedent was capable of performing existed in significant numbers in the national economy. (T. 25). Accordingly, the ALJ found the decedent "not disabled." (T. 24–25). The Appeals Council denied the decedent's request for review on May 10, 2002, at which time the ALJ's determination became the final decision of the Commissioner. (R. 5–6). Johnson has, therefore, exhausted all administrative remedies prior to seeking judicial review, and, accordingly, the Court has the proper authority, conferred statutorily, with which to commence its review.[5] See *Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Weinberger v. Sal-*

**5.** This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. section 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act and Rule 72, Fed.R.Civ.P. *See* Order of Referral (Entry # 2).

*fi,* 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. Apfel,* 234 F.3d 246 (5th Cir.2000); *McQueen v. Apfel,* 168 F.3d 152, 155 (5th Cir.1999); *see also* 42 U.S.C. § 405(g); 28 U.S.C. § 1383(c)(3) and 20 C.F.R. § 404.981 and/or 20 C.F.R. § 416 (1999), *as applicable.*

## STANDARDS OF REVIEW

### *The Motion for Summary Judgment*

The standards under which a summary judgment motion is to be considered are well established. Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is, therefore, entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), quoting *Fed.R.Civ.P. 56(c);* see also *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998); *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir.1993). The moving party bears the burden of showing that there is an absence of evidence to support the non-movant's case. *Id.* A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *PYCA Industries, Inc. v. Harrison County Waste Water Management District,* 177 F.3d 351, 361 (5th Cir. 1999); *Crowe v. Henry,* 115 F.3d 294, 296 (5th Cir.1997). The substantive law dictates which facts are "material." See *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir.), *cert. denied,* 528 U.S. 906, 120 S.Ct. 249, 145 L.Ed.2d 209 (1999); *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). An issue is material if its resolution could affect the outcome of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. Facts may be gleaned from reviewing the pleadings, answers to interrogatories, admissions and affidavits on file. See *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)(*en banc* ). In deciding whether a fact issue has been created, all justifiable inferences, must be viewed in the light most favorable to the nonmoving party, and questions of law are reviewed *de novo.* See *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Merritt–Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir. 1999); *Horton v. City of Houston,* 179 F.3d 188, 191 (5th Cir.1999). If the summary judgment motion is properly supported, however, the burden shifts from the movant to the adverse party, who may not rest on mere allegations or denials, but must set forth specific and supported material facts, of significant probative value, establishing that there exists a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Association of Machinists and Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.,* 199 F.3d 796, 798 (5th Cir.2000); *Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 119 (5th Cir.1982).

### *The Administrative Determination*

A review of the Commissioner's decision to deny disability benefits compels a determination of whether substantial evidence in the record supports the decision, and further, whether proper legal standards were used in evaluating the evidence. *Loza v. Apfel,* 219 F.3d 378, 389 (5th Cir.2000); *Estate of Morris v. Shalala,* 207 F.3d 744, 745 (5th Cir.2000); *Crowley v. Apfel,* 197 F.3d 194, 197 (5th Cir. 1999); *Jones v. Apfel,* 174 F.3d 692, 693 (5th Cir.1999). "Substantial evidence" means that which is more than a mere *scintilla* but less than a preponderance; and, it is evidence of such relevance that a

reasonable mind would accept it as adequate to support the conclusion reached. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995)(*per curiam* ). The Court is not, however, allowed to reweigh the evidence, retry the facts *de novo,* or substitute its judgment for that of the Commissioner. *Id.;* see also *Watson v. Barnhart,* 288 F.3d 212 (5th Cir.2002); and, any finding that there is no substantial evidence to support the Commissioner's determination is appropriate only if no credible evidentiary choices or medical findings exist to support the decision, *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Kinash v. Callahan,* 129 F.3d at 738; *Leggett v. Chater,* 67 F.3d 558, 566 (5th Cir.1995), thereby, compelling a "[j]udicial review [that is] deferential without being so obsequious as to be meaningless." *Brown v. Apfel,* 192 F.3d at 496; *Taylor v. Bowen,* 782 F.2d 1294, 1298 (5th Cir.1986).

### Determining the Existence of an Eligible Disability

"Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings; however, the ALJ's determination must conform to the legal standards established and be supported by substantial evidence. See *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel,* 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. *Id.* It remains, however, the claimant's burden to establish the disability. See *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992); see also *42 U.S.C.* §§ *416, 423.*

To determine the existence of an eligible disability there must, initially, be an evaluation of whether the claimant was unable to perform substantial gainful work existing in the national economy because of a medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted, or which can be expected to last, for a continuous period of not less than twelve (12) consecutive months. 42 U.S.C. §§ 416(1), 423(d)(1)(a), 1614(a)(3)(A); *Barnhart v. Walton,* 535 U.S. 212, 223–24, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 1599, 143 L.Ed.2d 966 (1999); *McQueen v. Apfel,* 168 F.3d at 154; *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A five-step sequential process is utilized by the ALJ to determine whether a claimant qualifies for disability benefits. See *20 C.F.R.* § *404.1520(b)-(f)(1998); Loza v. Apfel,* 219 F.3d at 390; *Leggett v. Chater,* 67 F.3d at 563. The claimant has the burden of establishing the first four steps of the five-step sequential process by establishing a severe impairment which prevents the claimant from performing past relevant work. In this five-step process, the ALJ considers:

1) whether the claimant is currently engaged in substantial gainful activity, as an individual who is working and engaging in substantial gainful activity will not be found disabled, regardless of the medical findings;

2) whether the claimant has a severe impairment;

3) whether the claimant meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, as such an individual will be considered disabled without consideration of vocational factors;

4) if an individual is capable of performing the work they did in the past, a

finding of not disabled must be made; and,

5) if an individual's impairment precludes them from performing their past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if there is any work in the national economy that the individual can perform.

*20 C.F.R. § 404.1520(b)-(f);* see also, *Carey v. Apfel,* 230 F.3d 131, 134–5 (5th Cir. 2000); *Brown v. Apfel,* 192 F.3d at 498; *Leggett v. Chater,* 67 F.3d at 566.

The Commissioner bears the burden as to the fifth step of the process. See *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001). If the Commissioner meets this burden, the claimant must then prove that he or she cannot, in fact, perform the alternate work suggested. See *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir.2002); *Carey v. Apfel,* 230 F.3d at 135. If, at any step of the analysis the ALJ finds that the claimant is or is not disabled, the inquiry is terminated. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Myers v. Apfel,* 238 F.3d at 619.

## DISCUSSION

### *The ALJ'S Determination of Mental Residual Functional Capacity is Not Supported by Substantial Evidence*

Johnson appeals the Commissioner's finding that the decedent was not disabled on two grounds. Johnson's first point of contention is that the ALJ erred by failing to consult with a psychiatric or psychological medical expert regarding the decedent's mental residual functional capacity. The First Circuit has held that the ALJ, as a lay fact finder, lacks sufficient expertise to conclude that a claimant has the abilities to perform certain tasks, and rather an explanation of the claimant's residual functional capacity from a physician is needed. *Rivera–Torres v. Secretary of Health and Human Services,* 837 F.2d 4, 7 (1st Cir. 1988).

20 C.F.R. § 404.1520(a) sets forth the technique to be followed in the evaluation of mental impairments. Under the procedure in effect at the time of the decedent's hearing before the ALJ,[6] the examiner of the mental disability claim (in this case, the ALJ) must first "record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in [the] case record," in order to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). If an impairment is found, the ALJ must determine whether certain medical findings relevant to a claimant's ability to work are present or absent. 20 C.F.R. § 404.1520a(b)(2). The ALJ must then evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work. 20 C.F.R. § 404.1520a(b)(3). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment "not severe," which generally concludes the analysis and terminates the proceedings. 20 C.F.R. § 404.1520a(c)(1). If the mental impairment is "severe" under 20 C.F.R. § 404.1520a(c)(1), the ALJ must then determine if it meets or equals a listed mental disorder under 20 C.F.R. pt. 404, subpt. P., app. 1, 12.00–12.09. 20 C.F.R. § 404.1520a(c)(2). If the impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct

---

**6.** Since the decedent's hearing, 20 C.F.R. § 404.1520a has been revised and amended. The revisions and amendments became effective on September 20, 2000. 65 Fed.Reg. 50,746 (August 21, 2000). The citations in this paragraph are to the regulations as they existed in 1999, when the decedent's case was being heard and considered by the ALJ and the Commissioner.

a residual functional capacity assessment. 20 C.F.R. § 404.1520a(c)(3). The ALJ must also append a "standard document outlining the steps of [the § 404.1520a procedure] to the decision." 20 C.F.R. § 404.1520a(d). *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir.2001).

In the present case, the ALJ did complete a PRTF. (T. 27–29). Further, in his decision, he incorporated his findings and conclusions based on the application of the technique, set forth the decedent's significant history, including her significant psychological history, and the functional limitations that were considered in reaching his conclusion as well as the degree of limitation. (T. 22–26). The ALJ's evaluation of the evidence specifically discusses the decedent's history of depression, her eighteen-day psychiatric hospitalization in 1992 and her outpatient treatment thereafter. The ALJ further discusses the report of the examining psychiatrist, Dr. Covert, concerning the psychiatric consultation Dr. Covert conducted with respect to the decedent. Further, the ALJ devotes an entire paragraph in his decision to describing Thomas' assessment of the decedent and his diagnosis of major depression. The ALJ's decision also includes a discussion of Dr. Jones' testimony at the hearing, including testimony that the decedent had a history of adjustment disorder with depressed mood and the opinion that the decedent had the ability to perform work-related activity at the light level of physical exertion, limited by the need to work in a low stress environment. (T. 22–23).[7] The ALJ further indicated that the medical evidence establishes that, among other things, the decedent's depression was "severe," but that she could not be found disabled based solely on a consideration of medical factors. (T. 19).

Moreover, in evaluating her residual functional capacity, the ALJ found that the decedent had the residual functional capacity to perform work-related activity at the light level of physical exertion, limited by the need to alternate sitting and standing at will, in a low stress work environment with limited contact with the public, and avoid jobs that require climbing or work at significant, unprotected heights, and around moving or dangerous equipment, repetitive wrist movements, and exposure of the claimant's hands to chemicals. (T. 23).

 It appears that the ALJ followed the necessary steps in completing the mental residual functional capacity evaluation as required by the statute. The Court is not satisfied, however, that substantial evidence exists to support the ALJ's findings. "Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings; however, the ALJ's determination must be supported by substantial evidence. See *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel,* 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. *Id.*

In the present case, the ALJ requested a medical expert, Dr. Lloyd C. Jones, to appear at the hearing in this case. Dr. Jones provided his opinion that the decedent was not disabled under the Social Security Act. (T. 64). Dr. Jones' testimony regarding the decedent's residual functional capacity, including the limitation to a "low-stress" work environment, related only to the decedent's physical or non-exertional limitations and did not address

---

**7.** It should be noted that Dr. Jones testified at the hearing regarding the decedent's history of "major depressive disorder" in opining that the decedent suffered from a "severe" disorder. (T. 63).

the decedent's mental limitations. (T. 64). The only other evidence in the record which would support the ALJ's conclusions with respect to mental residual functional capacity are the report of the non-treating psychiatrist, Covert, giving the decedent a GAF rating of 75 (R. 216) and the PRTF prepared by the non-treating, non-examining agency psychiatrist, Richard J. Alexander, on September 14, 1998. (R. 225). Each of these reports conflict in a very significant way with the opinions of the decedent's long-term treating therapist, Thomas.[8]

The record contains two items from Thomas consisting of two reports. There are no chart notes or other records of the decedent's treatment with Thomas in the record. Both of Thomas' reports were prepared after Drs. Covert and Alexander submitted their reports and they indicate a significant decline in the decedent's mental status. Drs. Covert's and Alexander's reports did not take Thomas' opinions into consideration. The record is also missing the records of the decedent's psychiatric hospitalization at Belle Park Hospital and there is no indication that Drs. Covert and Alexander reviewed the psychiatric hospital records prior to rendering their opinions. Thus, the only evidence in the record supportive of the ALJ's findings on mental residual functional capacity are reports of doctors who did not fully evaluate the relevant medical evidence. Because the record lacks a thorough and complete analysis of the decedent's residual func-

tional capacity from a physician, the Court must remand the instant case to the ALJ to obtain such a determination. *See, Rivera–Torres*, 837 F.2d at 7.

■ Further, the ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. If the ALJ does not satisfy his duty, his decision is not substantially justified. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995). The ALJ did not develop the facts fully and fairly in this case and, on remand, the ALJ should obtain the records of the decedent's psychiatric hospitalization at Belle Park Hospital, along with any additional records of the decedent from mental health related sources that may be elicited from a review of the Belle Park Hospital records. Further, on remand, once these records have been obtained, the ALJ should refer this matter to a competent psychiatrist for a complete evaluation of the decedent's mental residual functional capacity, including a specific instruction that the reviewing physician review all the decedent's relevant medical records, including the records of Belle Park Hospital, Dr. Gold and the therapist, Thomas, prior to rendering his or her opinion.

### The ALJ Erred By Relying on Defective Vocational Expert Testimony Regarding other Work that The Decedent Could Perform

■ Johnson's second contention is that the ALJ erred by relying on vocational

---

**8.** The Court does not agree with the Defendant's contention that Thomas' opinion should be accorded lesser weight than Dr. Covert's because Thomas is a licensed social worker and not a psychiatrist. The record indicates that Thomas regularly treated the decedent for many years and that the decedent was, in fact, referred to Thomas for psychiatric follow-up care by Belle Park Hospital upon her release from the hospital. Dr. Covert examined the decedent on only one

occasion, and it appears that he did not fully review or evaluate her relevant psychiatric history before making his conclusions. Although the Court is not weighing the relative merits of these individuals' opinions in reaching its decision, it is pointed out that under the circumstances of this case, the mere fact that Dr. Covert has a degree in Psychiatry would not persuade the Court that his opinions should be accorded any greater weight than Thomas'.

expert testimony regarding other work that the decedent could perform in that the vocational expert's testimony was in conflict with the Dictionary of Occupational Titles (DOT), and thereby, in violation of Social Security Ruling (SSR) 00–4p, effective December 4, 2000. Initially, it should be noted that SSR 00–4p is not retroactive and explicitly states as follows regarding its effective date:

> This Ruling is effective on the date of its publication in the Federal Register. The clarified standard stated in this ruling with respect to inquiring about possible conflicts applies on the effective date of the ruling to all claims for disability benefits in which a hearing before an ALJ has not yet been held, or that is pending a hearing before an ALJ on remand. The clarified standard on resolving identified conflicts applies to all claims for disability or blindness benefits on the effective date of the ruling.

In the present case, the hearing before the ALJ took place on June 14, 1999, prior to the publication of SSR–00–4p in the Federal Register on December 4, 2000. Pursuant to the express language of SSR–00–4p, the ruling is inapplicable to the case at bar.

Johnson further contends that the VE's testimony is unreliable in that it conflicts with the DOT. With respect to this purported conflict, Johnson contends that the DOT must control and, consequently, there is no substantial evidence that the decedent could perform the jobs listed by the VE. The Fifth Circuit recently provided guidance on this issue in *Carey v. Apfel,* 230 F.3d 131 (5th Cir.2000). In *Carey,* the Court recognized the types of conflicts that may arise between the DOT, the testimony of the VE, and the findings of the ALJ. *Id.* at 144, n. 2. The Court also noted and discussed a split among the circuit courts as to what the controlling authority should be when the VE's testimony conflicts with the DOT. *Id.* at 144–145. In *Carey,* the

Court failed to find that an actual conflict between the VE's testimony and the DOT existed in the case before it, but it did, nevertheless, provide guidance as to how such conflicts could be construed in cases in this Circuit. *Id.* at 146–47. In particular, the Fifth Circuit stated:

> [W]e agree with the majority of the circuits that the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. As the facts of this case demonstrate, all kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. Adopting a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling, permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs.

Pursuant to the direction the Fifth Circuit has provided in resolving this particular issue, the inquiry in the present case should not focus on whether the ALJ failed to resolve any conflict between the VE testimony and the DOT, as Johnson contends, but rather should be whether there is substantial evidence in the record to support the ALJ's finding that ·Gloria Johnson could do the particular jobs the VE identified. Johnson argues that the ALJ must reconcile conflicts between the

VE's testimony and contrary DOT provisions, citing SSR 00–4p and "prior case law," but has not cited any particular case authority in support of the proposition. As previously addressed, to the extent SSR 00–4p establishes such a duty on the part of the ALJ, it is not applicable to the case a bar due to the fact that it was promulgated after the ALJ's hearing in this case. Further, the court has been unable to locate case authority in this Circuit, rendered prior to the enactment of SSR 00–4p, establishing such a duty on the part of the ALJ.

■ The analysis, therefore, shifts to whether there is substantial evidence to support the ALJ's reliance on the VE's testimony. In this regard, there is insufficient evidence in the record to justify the ALJ's reliance on the VE's testimony because the ALJ's hypothetical question to the vocational expert did not reasonably incorporate all of the functional limitations supported by the record. As such, the Commissioner failed to meet her burden of proof in establishing that the decedent could perform other work which exists in significant numbers in the national economy.

At the fourth step of the process, the ALJ determined that the decedent was incapable of performing her past work as a housekeeper in a hospital. However, at the fifth step of the process, the ALJ found that the decedent did retain the residual functional capacity to perform certain limited light duty work available in significant numbers in the national economy and, accordingly, she was not "disabled" for purposes of qualifying for social security disability benefits. The Commissioner bears the burden at the fifth step of the process. See *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001).

The ALJ attempted to elicit evidence regarding the availability of appropriately limited light duty work available in significant numbers in the national economy through the testimony of the VE, Ted Jolly. Testifying at the hearing, Jolly could provide no jobs that the decedent was capable of performing in response to the initial hypothetical question posed to him by the ALJ, in which he was asked to assume the following limitations: "alternate between sitting and standing, lift no more than 10 pounds at a time, further restrictions of no heights or climbing, no moving or dangerous equipment, no repetitive wrist movements, no exposures to chemicals as far as the hands are concerned, low stress, limited dealing with the public. . . ." (T. 78–80).[9] The ALJ then attempted to rehabilitate Jolly's testimony by asking him, "Well, I'll say I'll bump it up to light lifting up to 20 pounds occasionally, 10 pounds frequently, what would be your response? Can you give me three there?" (T. 79). In response to that follow-up question, Jolly listed three different jobs. (T. 79–81). The ALJ, however, did not preface his follow-up question to Jolly with words to the effect of "assuming all other elements of the hypothetical remain the same." Therefore, it is not clear whether Jolly was referring to jobs that would be limited solely to lifting up to twenty pounds occasionally and ten pounds frequently, or whether his testimony referred to that limitation along with some or all of the various other limitations in the ALJ's initial hypothetical.

9. Jolly was not asked to assume in any hypothetical the ALJ's findings that Gloria Johnson "often has deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner (in work settings or elsewhere)" and has "once/twice had episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms."

■ A hypothetical question to a VE is deemed defective and in error unless (1) the assumptions reasonably incorporate all of the disabilities recognized by the ALJ, and (2) the claimant is afforded the opportunity to correct deficiencies in the ALJ's question. *Boyd,* 239 F.3d at 707; *Bowling v. Shalala,* 36 F.3d 431, 437 (5th Cir.1994). Part one of the test is not met here because the ALJ's hypothetical question to Jolly did not include all the decedent's myriad disabilities as recognized by the ALJ. As the first prong of the test is not met, the second prong need not be addressed. See *Boyd,* 239 F.3d at 707 (the holding in *Bowling* did not state that a party's failure to point out the problems in a defective hypothetical automatically salvages that hypothetical as a proper basis for a determination of non-disability). Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, an ALJ may properly rely on the VE's testimony and conclusion. *Leggett v. Chater,* 67 F.3d 558, 565 (5th Cir.1995). "Unless there is record evidence to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless." *Bowling,* 36 F.3d at 436. The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. If the ALJ does not satisfy his duty, his decision is not substantially justified. *Boyd,* 239 F.3d at 708 (citing *Newton v. Apfel,* 209 F.3d 448, 458 (5th Cir.2000) and *Ripley,* 67 F.3d at 557). Where the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite the decedent's impairments, the decedent could have perform available work. *Id.* In the absence, as here, of clear testimony from the VE, or other credible evidence in the record that jobs existed in sufficient numbers in the national economy to accommodate all of the decedent's limitations, substantial evidence to support the ALJ's finding of no disability is lacking, and the Commissioner has failed to meet her burden of proof on this issue. On remand, the ALJ should obtain a competent and credible evaluation of the availability and existence of jobs in the national and local economy that the decedent could have performed in light of her limitations, should this issue continue to remain relevant following the additional disability evaluation that the ALJ is to conduct on remand as discussed above.

■ A judicial review pursuant to 42 U.S.C. § 405(g) allows an aggrieved claimant to file a civil action in an appropriate district court of the United States. Section 405(g) also provides two (2) alternative ways in which a case can be remanded. A "sentence four" remand is appropriate where the district court enters a judgment affirming, modifying or reversing the Commissioner's decision, with or without remanding the cause for a rehearing, and a "sentence six" remand is appropriate where the Commissioner requests a remand or where new, material evidence is adduced that was for good cause not previously presented before the agency. See *Luna v. United States Dept. of Health and Human Services,* 948 F.2d 169, 172 (5th Cir.1991). These are the only types of remand permitted under the statute. *Melkonyan v. Heckler,* 895 F.2d 556 (9th Cir. 1990).

When a federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an ALJ with instructions to take action and issue a decision or return the case to the Appeals Council with a recommended decision. 20 C.F.R. § 404.983. The Appeals Council will either make a new, independent decision based on the entire record that will be the final decision of the Com-

missioner after remand or remand the case to an ALJ for further proceedings. 20 C.F.R. § 404.984(a). It is appropriate under the regulations for the Commissioner to render a new independent decision upon remand.

However, when the district court remands a case to the Social Security Administration with instructions, the administrative agency may not disregard the court's order. Where a court finds that the Commissioner has committed a legal or factual error in evaluating a particular claim, the district court's remand order should include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed. *Sullivan v. Hudson*, 490 U.S. 877, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989). Hence, deviation from the court's remand order in the subsequent administrative proceeding is itself legal error, subject to reversal on further judicial review. *Id.*, citing *Hooper v. Heckler*, 752 F.2d 83, 88 (4th Cir.1985).

## CONCLUSION

Following a review of the entire record, it is determined that the ALJ applied the correct legal standard, but his decision to deny benefits was not supported by substantial evidence. It is **RECOMMENDED** that this case be **REMANDED** to the Social Security Administration for rehearing to (1) obtain the records of Gloria Johnson's psychiatric hospitalization at Belle Park Hospital and records of Gloria Johnson from any other treating or examining mental health care sources identified in those records; (2) refer this matter to a competent psychiatrist for a complete evaluation of the decedent's mental residual functional capacity, including a specific instruction that the reviewing physician review all the decedent's relevant medical records, including the records of Belle Park Hospital, Dr. Gold and Thomas; and (3) if a finding of "not disabled" is still

made after the additional review described above, the ALJ is to obtain a competent and credible evaluation of the availability and existence of jobs in the national and local economies that the decedent could have performed in light of all her limitations, both physical and mental. It is therefore

**RECOMMENDED** that Johnson's Motion for Summary Judgment (Entry # 10) be **GRANTED**. Further, it is

**RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Entry # 11) be **DENIED**. Additionally, it is

**RECOMMENDED** that this action be **REMANDED** to the Commissioner pursuant to "sentence four" of section 405(g), to consider mental capacity evidence for Gloria Johnson.

The Clerk shall file this Memorandum and Recommendations and provide all parties a true copy. The failure to file written objections to the proposed findings and recommendations within ten (10) days of the entry of this Memorandum and Recommendations, may bar an aggrieved party, except upon grounds of plain error, from attacking the proposed factual findings and legal conclusions, on appeal. See *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Services Automobile Assoc.*, 79 F.3d 1415, 1424 (5th Cir.1996)(*en banc*); see also *Crawford v. Falcon Drilling Co., Inc.*, 131 F.3d 1120, 1123–4 (5th Cir.1997); and, 28 U.S.C. § 636(b)(1)(C).

Feb. 24, 2003.