# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 14, 2005                    Decided June 21, 2005

No. 04-1052

NORTHPOINT TECHNOLOGY, LTD. AND
COMPASS SYSTEMS, INC.,
APPELLANTS

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

———

No. 04-1053

NORTHPOINT TECHNOLOGY, LTD. AND
COMPASS SYSTEMS, INC.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION,
RESPONDENT

———

Notice of Appeal and Petition for Review of an Order of the
Federal Communications Commission

———

*Michael K. Kellogg* argued the cause for the appellants/
petitioners. *John C. Rozendaal* and *Antoinette Cook Bush* were

on brief.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for the appellee/respondent. *R. Hewitt Pate,* Assistant Attorney General, *Robert B. Nicholson* and *Steven J. Mintz,* Attorneys, United States Department of Justice, and *John A. Rogovin*, General Counsel, *Austin C. Schlick*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, were on brief.

Before: EDWARDS, HENDERSON, and RANDOLPH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Northpoint Technology, Ltd., and its subsidiary, Compass Systems, Inc. (collectively, Northpoint), petitions for review[1] of the decision

---

[1] Northpoint timely filed both a petition for review (No. 04-1053) under section 402(a) and an appeal (No. 04-1052) under section 402(b) of the Communications Act. *See* 47 U.S.C. § 402(a)-(b). Because subsections (a) and (b) are "mutually exclusive," *Friedman v. FCC*, 263 F.2d 493, 494 (D.C. Cir. 1959), "a claim directed to the same matters may be brought only under one of the two provisions." *Tribune Co. v. FCC*, 133 F.3d 61, 66 n.4 (D.C. Cir. 1998); *accord Freeman Eng'g Assocs. v. FCC*, 103 F.3d 169, 177 (D.C. Cir. 1997). Subsection (a) provides for review in the courts of appeals of "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission," 47 U.S.C. § 402(a), while "relief . . . under 402(b) requires as a trigger the grant or denial of a license application." *Waterway Communications Sys., Inc. v. FCC*, 851 F.2d 401, 403 (D.C. Cir. 1988); *accord Freeman Eng'g Assocs.*, 103 F.3d at 177; *see also* 47 U.S.C. § 402(b). Because Northpoint challenges only the Commission's conclusion regarding its authority to auction licenses for DBS service, not the actual grant or denial of a license or any action "ancillary to" such a licensing decision, *Tomah-Mauston Broad. Co. v. FCC*, 306 F.2d 811, 812 (D.C. Cir. 1962) (internal

of the Federal Communications Commission (FCC or Commission) in *Auction of Direct Broadcast Satellite Licenses*, Order, 19 FCC Rcd 820 (2004) (*DBS Auction Order*), *reprinted in* Joint Appendix (J.A.) at 7-23. Specifically, Northpoint challenges the Commission's conclusion that, notwithstanding the Congress's enactment of section 647 of the Open-market Reorganization for the Betterment of International Telecommunications Act (ORBIT Act), Pub. L. No. 106-180, § 647, 114 Stat. 48 (2000) (codified at 47 U.S.C. § 765f), the Commission remains authorized to auction licenses to operate Direct Broadcast Satellite (DBS) service[2] channels. We agree with Northpoint that the Commission's interpretation of section 647 of the ORBIT Act cannot stand on the current administrative record and, accordingly, we set aside Part III.A of the *DBS Auction Order* and remand for the Commission's further consideration.

## I.

In March 2002, Northpoint's subsidiary, Compass Systems, Inc. (Compass), submitted to the Commission an application for

---

quotation marks omitted), Northpoint properly invoked our section 402(a) jurisdiction. Accordingly, we dismiss Northpoint's appeal, No. 04-1052, and treat only its petition for review, No. 04-1053. *See NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130, 140 (D.C. Cir. 2001).

[2] The FCC defines "Direct Broadcast Satellite Service" as "[a] radiocommunication service in which signals transmitted or retransmitted by space stations, using frequencies specified in § 25.202(a)(7), are intended for direct reception by the general public." 47 C.F.R. § 25.201 (definitions). DBS is known as Broadcast Satellite Service (BSS) internationally. *See Amendment to the Commission's Regulatory Policies Governing Domestic Fixed Satellites & Separate International Satellite Systems*, Report & Order, 11 FCC Rcd 2429, 2438, ¶ 57 (1996).

licenses to provide DBS service from unassigned channels at two of the eight orbital positions—157˚ and 166˚ west longitude—assigned to the United States by the International Telecommunications Union (ITU) at the 1983 Regional Administrative Radio Conference for the Planning in Region 2 of the Broadcasting-Satellite Service in the Frequency Band 12.2-12.7 GHz and Associated Feeder Links in the Frequency Band 17.3-17.8 GHz (the ITU Region 2 Band Plan or Plan). The International and Wireless Telecommunications Bureaus (Bureaus) dismissed Compass's application as premature one year later. *See Letter to Antoinette Cook Bush*, 18 FCC Rcd 3091 (Int'l & Wireless Telecomms. Burs. 2003). The Bureaus explained that, because the Commission's competitive bidding rules governed the awarding of the DBS service licenses Compass sought, Compass's application would be accepted only during an established filing window. *See id.* While the Bureaus observed that there was no filing window currently open "with respect to licenses for the DBS channels [Compass] seeks," they nevertheless pointed out that "today the Commission has issued a public notice announcing the auction of DBS service licenses scheduled for August 6, 2003." *See id.* at 3091-92.

The public notice to which the Bureaus referred proposed the auction of four DBS service licenses, including the two sought by Compass. *See* Public Notice, *Auction of Direct Broadcast Satellite Service Licenses Scheduled for August 6, 2003*, 18 FCC Rcd 3478 (2003), *reprinted in* J.A. at 25-38. In addition to announcing the upcoming auction, the Commission invited public comment on its authority *vel non* to hold the auction. *See id.* at 3480. The Commission had initially concluded that section 647 of the ORBIT Act, which provides in part that "the Commission shall not have the authority to assign by competitive bidding orbital locations or spectrum used for the provision of international or global satellite communications

services,"[3] 47 U.S.C. § 765f, did not divest it of authority to auction DBS service licenses "because," it said, "they are not authorizations to use spectrum 'for the provision of international or global satellite communications services.' " 18 FCC Rcd at 3479 (quoting 47 U.S.C. § 765f). The Commission received four comments in response to its invitation, including Northpoint's. *See DBS Auction Order*, 19 FCC Rcd at 823, ¶ 6 & n.14. Only Northpoint challenged the Commission's authority to auction licenses to operate DBS service channels. *See id.* at 824-25, ¶¶ 9-11.

In the end Northpoint's comments did not persuade the Commission. Finding Northpoint's two statutory arguments "without merit," the Commission reaffirmed its original conclusion. *Id.* at 826, ¶ 13. It first disagreed with Northpoint's "exceedingly broad reading of the ORBIT Act auction prohibition," explaining that "it would be unreasonable to conclude that Congress intended that the incidental provision of transborder service would convert an otherwise auctionable license into an unauctionable one." *Id.* at 826, ¶ 14. The Commission relied in part on the ORBIT Act's legislative history. *See id.* at 826-27, ¶ 14. It explained that, while the

---

[3] Section 647 of the ORBIT Act provides *in toto*:

> Notwithstanding any other provision of law, the Commission shall not have the authority to assign by competitive bidding orbital locations or spectrum used for the provision of international or global satellite communications services. The President shall oppose in the International Telecommunication Union and in other bilateral and multilateral fora any assignment by competitive bidding of orbital locations or spectrum used for the provision of such services.

47 U.S.C. § 765f.

House Commerce Committee Report accompanying a bill containing an identical exemption "indicated that an auctions exemption could help [global or international satellite communications] service providers avoid financial burdens they might otherwise face if a U.S. auction regime precipitated a succession of auctions in numerous countries in which the operators might seek to provide service," the auctioning of DBS service licenses "does not raise these concerns because these licenses are for channels designed under the Plan to serve the United States." *Id.*

The Commission next rejected Northpoint's "conjectures about the possibility of DBS licensees providing a full-fledged international service." *Id.* at 827, ¶ 15. According to the Commission, "the DBS licenses that are slated for auction cannot now be—nor are they anticipated to be—used to provide any significant degree of international service." *Id.* It explained that the " 'coverage' maps" Northpoint relied on identified "areas of the world that are visible from certain orbit locations," not the "actual coverage areas of those orbital positions as defined in the ITU Region 2 Band Plan." *Id.* It also observed that DBS service is not an international service simply because "[s]atellite beams . . . illuminate beyond the borders of a particular country." *Id.* On the contrary, "in order to have full coverage of a national territory, coverage of regions beyond those borders is to be expected." *Id.* The Commission further noted that a licensee wishing to provide service outside the United States must obtain a modification of the Plan—"a process," it advised, "that has no guarantee of success." *Id.*

The Commission also rejected Northpoint's contention that it had previously considered DBS service to be an international service in *Amendment to the Commission's Regulatory Policies Governing Domestic Fixed Satellites & Separate International Satellite Systems*, Report & Order, 11 FCC Rcd 2429 (1996) (*DISCO I*), explaining that in *DISCO I* it concluded only that "it

should not impose regulatory barriers on a licensee interested in providing DBS service *outside* the United States." *See* 19 FCC Rcd at 827, ¶ 16 (emphasis added). Since *DISCO I*, the Commission observed, it had received only four proposals to provide DBS service beyond the borders of the United States and "currently all U.S.-licensed providers of DBS service are providing service only to the United States and not to any foreign counties." *See id.* at 828, ¶ 16.

The Commission next explained that, contrary to Northpoint's claim, the Commission did not routinely secure a modification of the ITU Region 2 Band Plan for a "U.S.-licensed DBS operator in order for such an operator to provide international service." *Id.* at 829, ¶ 17. According to the Commission, most of the cases in which it had sought modification "have had nothing to do with the provision of service outside the United States" and that it had sought modification "on behalf of a licensee proposing to provide international service from a U.S. orbit location in only two instances." *Id.*; *see also id.* n.38.

The Commission further noted that its authorization of the EchoStar 7 satellite did not mean that it considered DBS service to be international service. *See id.* at 830, ¶ 18. It explained that its observation in *EchoStar Satellite Corporation, Application for Minor Modification of Direct Broadcast Satellite Authorization, Launch & Operating Authority for EchoStar 7*, Order & Authorization, 17 FCC Rcd 894, 896, ¶¶ 4-5 (Chief, Satellite & Radiocomm. Div., Int'l Bur. 2002) (*Echostar*), that it "permits DBS licensees to provide DBS service in other countries," *id.* at 896, ¶ 5, simply responded to an argument that it "should require EchoStar to direct all of its proposed spot beams to locations within the United States." 19 FCC Rcd at 830, ¶ 18. The Commission stated that EchoStar 7 "was designed to provide service to the United States, including Alaska and Hawaii, on its assigned channels" and that it was allowed to direct one spot beam toward Mexico because that

beam could not be directed within the United States "without causing harmful self-interference into other spot beams in its own fleet." *Id.* at 830-31, ¶ 19. And EchoStar "may" use this beam, the Commission explained, "if Echostar decides to provide service to Mexico and obtains any necessary authority from [Mexico] to do so." *Id.* at 831, ¶ 19.

The Commission also rejected Northpoint's contention that the ORBIT Act prohibits the auction of DBS service licenses because DBS service "relies on spectrum that is 'used for the provision of,' " *id.* at 831, ¶ 20 (quoting 47 U.S.C. § 765f), Non-geostationary Fixed Satellite Service (NGSO FSS or FSS) which, according to Northpoint, is " 'indubitably' " an international satellite communications service. *Id.* The Commission explained that it construed the relevant language of section 765f of the ORBIT Act to "focus on whether the particular spectrum being 'assigned' is 'used for' international or global satellite communications services" and that DBS service licenses are "limited almost exclusively to domestic use." *Id.* at 832, ¶ 20. The Commission therefore concluded that, "[b]ecause NGSO FSS and DBS licenses are assigned entirely separately, there is no reason to read the ORBIT Act to constrain the DBS license assignments merely because NGSO FSS shares the same spectrum band." *Id.*

On July 14, 2004, the Commission auctioned three DBS service licenses,[4] two of which were the 157° and 166° west

---

[4] Only three licenses (instead of four) ended up on the block. *See DBS Auction Order*, 19 FCC Rcd at 821, ¶ 1. While the Commission declined to impose any ownership eligibility restrictions on the DBS service licenses available at the western orbit locations (175° W.L., 166° W.L. and 157° W.L.), it reserved the question whether the ownership of the DBS service license available at the eastern orbit location (61.5° W.L.) should be subject to eligibility restrictions. *See id.* at 833-34, ¶¶ 25-27. As the Commission had to resolve that issue

longitude orbital locations Northpoint had applied for. Two bidders won the three licenses for a total of $12.3 million. Northpoint did not participate in the auction; instead, on February 17, 2004, it petitioned for review of the FCC's *DBS Auction Order*.

## II.

Unwilling to take no for an answer, Northpoint again challenges the FCC's construction of section 647 of the ORBIT Act with the two statutory arguments the Commission concluded were "without merit." *See DBS Auction Order*, 19 FCC Rcd at 826, ¶13. Northpoint first argues that licenses for DBS service channels fall within the ORBIT Act's auction ban because DBS service is, in light of the Commission's prior treatment of it, an "international or global satellite communications" service. 47 U.S.C. § 765f. "Having treated DBS as an international service for years," Northpoint asserts, "the FCC cannot now pretend that the service is purely domestic simply to gratify its own desire to assign DBS orbital locations and spectrum via auction." Petitioners' Br. at 23. In so doing, Northpoint says, the Commission "deviate[d] from previous policy *without even acknowledging that it has deviated*." Petitioners' Br. at 23 (emphasis in brief).

Northpoint additionally asserts that even if DBS service is not itself an "international or global satellite communications" service under section 647 of the ORBIT Act, the *spectrum* DBS service uses cannot be auctioned because it is "used for the provision of international or global satellite communications" service within the meaning of section 647. 47 U.S.C. § 765f. As Northpoint sees it, "if a particular portion of the spectrum is

---

before it could auction the license for the eastern orbit location, it did not proceed with auctioning that license on July 14, 2004. *See id.* at 833-34, ¶¶ 26-27.

used *by anyone* for international service," then no portion of the spectrum may be awarded by competitive bidding "even if a particular licensee or group of licensees will use that spectrum only for domestic service." Petitioners' Br. at 24-25 (emphasis in brief). That is, in Northpoint's view, section 647's "denial of auction authority is based on the spectrum in which the applicant seeks to operate, rather than on the character of the applicant." Petitioners' Br. at 26. Therefore, because DBS service and NGSO FSS service share a slice of spectrum—the 12.2-12.7 GHz downlink band—and NGSO FSS uses the spectrum for international or global satellite communications service, section 647 of the ORBIT Act prohibits the Commission from auctioning DBS service licenses. *See* Petitioners' Br. at 25-27.

We review the Commission's interpretation of section 647 of the ORBIT Act under the methodology announced by the United States Supreme Court in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), under which we defer to the Commission's interpretation of the Communications Act so long as the Congress has not unambiguously forbidden it and the interpretation is otherwise permissible. *See id.* at 842-43; *see also Barnhart v. Walton*, 535 U.S. 212, 218 (2002). That is, under the *Chevron* two-step, we stop the music at step one if the Congress "has directly spoken to the precise question at issue" because we—and the agency—"must give effect to [its] unambiguously expressed intent." *Chevron U.S.A. Inc.*, 467 U.S. at 842-43. "If the intent of Congress is clear, that is the end of the matter." *Id.* at 842. But if the statute is silent or ambiguous, we dance on and, at step two, defer to the Commission's interpretation if it is "based on a permissible construction of the statute." *Id.* at 843. A "reasonable" explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a "permissible" construction is made, *id.* at 863; *see, e.g., Continental Air Lines v. Dep't of Transp.*, 843 F.2d 1444, 1452 (D.C. Cir. 1988); an explanation that is "arbitrary, capricious, or manifestly contrary

to the statute," however, is not. *Chevron U.S.A. Inc.*, 467 U.S. at 844; *see, e.g., Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002); *cf. Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) ("[W]e have recognized that an arbitrary and capricious claim and a *Chevron* step two argument overlap . . . ."); *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726 (D.C. Cir. 1994) ("[T]he inquiry at the second step of *Chevron* overlaps analytically with a court's task under the Administrative Procedure Act . . . ."). In this case the Commission trips at step two.

To the extent that Northpoint couches its arguments in *Chevron* step one terms—*i.e.*, that section 647 of the ORBIT Act unambiguously prohibits the auctioning of licenses to operate DBS service channels—it misses the mark. *See Walton*, 535 U.S. at 218 (step one asks "whether the statute unambiguously forbids the Agency's interpretation"). Section 647's ambiguity is plain and profound, as Northpoint's counsel conceded at oral argument. *See* Tr. of Oral Argument at 4-5 (statute "absolutely" ambiguous). The section provides that "the Commission shall not have the authority to assign by competitive bidding orbital locations or spectrum *used for* the provision of international or global satellite communications services." 47 U.S.C. § 765f (emphasis added). Orbital locations or spectrum not yet assigned by the Commission, however, are plainly not "used for" *any* type of service, including international or global satellite communications services. *Id.* § 765f. Accordingly, because the statute, if read literally, would limit the Commission's auction authority based on non-existent conditions, it is ambiguous and requires interpretation. *See Chevron U.S.A. Inc.*, 467 U.S. at 843.

Under *Chevron* step two, the Commission's interpretation of section 647 at first blush appears plausible. The Commission interpreted "the language of the statutory prohibition to focus on whether the particular spectrum being 'assigned' is 'used for'

international or global satellite communications services." *DBS Auction Order*, 19 FCC Rcd at 832, ¶ 20. This makes sense as section 647 prohibits only the auctioning of spectrum that is "used for" international or global satellite communications service, *see* 47 U.S.C. § 765f; it does not *expressly* prevent the auctioning of spectrum that is "used for" domestic satellite communications services simply because that spectrum is also "used for" for international or global satellite communications services. This construction is consistent with the statute's apparent purpose of deterring foreign governments from auctioning spectrum used to provide international or global satellite communications services. As the Commission points out, the scant legislative history of section 647 consists of a House Report on an earlier bill (with an auction prohibition identical to section 647) that noted "concurrent or successive spectrum auctions in the numerous countries in which U.S.-owned global satellite service providers seek downlink or service provision licenses could place significant financial burdens on providers of such services," H.R. REP. NO. 105-494, at 65 (1998), a concern that is manifested in section 647's second sentence. *See* 47 U.S.C. § 765f ("The President shall oppose in the [ITU] and in other bilateral and multilateral fora any assignment by competitive bidding of orbital locations or spectrum used for the provision of such services."). A strictly *domestic* satellite communications service, however, has nothing to do with multiple spectrum auctions in foreign jurisdictions. And given that satellite beams do not stop at national borders, there is also logic to the Commission's rejection of Northpoint's contention that DBS service is an international or global satellite communications service on account of transborder "spill-over." Northpoint's contention would tend to blur a distinction implicit in the statute: Section 647's reference to "international" service implies that there is also non-international, or domestic, service—that is, that not all "satellite communications service[]" is necessarily "international." *See id.* The Commission's

argument that "it would be unreasonable to conclude that Congress intended that the incidental provision of transborder service would convert an otherwise auctionable license into an unauctionable one" is thus not unreasonable. 19 FCC Rcd at 826, ¶ 14. While its construction may be permissible under section 647, however, we cannot defer to it on this record for at least three reasons which we now explain.

First, the Commission's reliance on the ITU Region 2 Band Plan as a basis for treating DBS service as a solely domestic satellite communications service is dubious in light of the policy it announced in *DISCO I*. Here, the Commission declares that "the DBS licenses that are slated for auction cannot now be—*nor are they anticipated to be*—used to provide any significant degree of international service" because a licensee desiring to "provide service outside the United States, inconsistent with the ITU Region 2 Band Plan" must request modification of the Plan, which "is a process that has no guarantee of success, as it requires the agreement of other [foreign] administrations that have DBS assignments that may be affected by the modification." *Id.* at 827, ¶ 15 (emphasis added). But in *DISCO I* the Commission took a more sanguine view of the bureaucratic gauntlet—involving both procedural and substantive components—an FCC licensee seeking to provide international DBS service from U.S. orbital locations must run. Rather than suggesting, as it does now, that modification of the Plan poses a formidable substantive bar, in *DISCO I* the Commission explained that the Plan "was written primarily for domestic use, but it does not *preclude* the provision of international DBS service." 11 FCC Rcd at 2438 n.76 (emphasis added). There it stated that, while the Plan "specifies the technical parameters under which DBS systems are to operate," the Plan may nevertheless "be modified to permit non-standard [including international] satellites and operations." *Id.* at 2438, ¶ 57.

Moreover, the Commission mischaracterizes *DISCO I* in asserting that its current conclusion that DBS is a "predominantly domestic" service "does not represent a departure from" its earlier order. 19 FCC Rcd at 828, ¶ 16. In *DISCO I* the Commission did not simply decline to "impose regulatory barriers on a licensee interested in providing DBS service outside the United States" or do no more than "note[] the potential advantages of international DBS service" while not "conclud[ing] that such service would be anything other than incidental to domestic service," as the Commission now says, *id.* at 827-28, ¶ 16; instead, it stated that it intended to "encourage" DBS service licensees to provide "both domestic *and international* services from their authorized channels." 11 FCC Rcd at 2439, ¶ 67, ¶ 70 (emphasis added). It sought to "encourage international DBS service," the Commission in *DISCO I* concluded, "since it would advance the public interest," including by "expand[ing] the potential audience for American programming." *Id.* at 2439, ¶ 67. Discussing one way to further this interest, the Commission noted that "the possibility of providing international DBS services *to Pacific Rim nations* could make the western-most DBS orbital locations allocated to the United States—from which no permittee appears ready to operate in the near future—more attractive platforms, which could accelerate development of those locations and thereby accelerate the delivery of DBS service to Hawaii and Alaska." *Id.* at 2439, ¶ 67 (emphasis added). Its present attempt to characterize *DISCO I* as merely announcing a policy of regulatory forbearance is thus perplexing and, ultimately, unconvincing.

Indeed, the Commission gives every appearance of practicing the policy it preached in *DISCO I.* As Northpoint points out, the Commission permitted EchoStar to launch a satellite that aimed a spot beam directly at Mexico City, a site hundreds of miles from our border. *See EchoStar*, 17 FCC Rcd at 896, ¶¶ 4-5. The Commission minimized this fact here, stating that, while

EchoStar's satellite "was designed to provide service to the United States," EchoStar was compelled to aim a beam at Mexico City because it "could not technically direct this particular spot beam into the United States without causing harmful self-interference into other spot beams in its own fleet" and that EchoStar might eventually use this international beam "if [it] decides to provide service to Mexico and obtains any necessary authority from" Mexico. *DBS Auction Order*, 19 FCC Rcd at 830-31, ¶ 19. But in *EchoStar* the Commission went further, reaffirming its *DISCO I* policy: "[T]he Commission permits DBS licensees *to provide DBS service in other countries*, in accordance with U.S. treaty obligations, *from U.S. DBS orbit locations*, provided the satellite operator obtains all necessary approvals from the foreign administration." *EchoStar*, 17 FCC Rcd at 896, ¶ 5 (emphases added). The Commission even noted in the order under review that, pursuant to an agreement the United States reached with Mexico and Argentina, EchoStar may provide DBS service in those territories "if all necessary modifications to the ITU Region 2 Band Plan are obtained." *DBS Auction Order*, 19 FCC Rcd at 831, ¶ 19 n.47. And in its brief to us, it notes that a proposed modification of the Plan to accommodate this international service is pending. *See* Respondent's Br. at 19. Furthermore, while the Commission suggests that it is no "routine matter" for it to seek modification of the Region 2 Band Plan on behalf of a licensee desiring to provide international DBS service, it concedes that it has *twice* done so. *See DBS Auction Order*, 19 FCC Rcd at 828-29, ¶¶ 16-17 & n.36. The Commission's contention that the Region 2 Band Plan restricts DBS service to domestic markets thus cannot be squared with *DISCO I*.

Second, despite the Commission's attempt to convert the Plan into a substantive bar to international DBS service (or BSS), it conceded at oral argument that there is no international treaty or other agreement (including the Plan) that prohibits a licensee from providing international DBS service from the orbital

locations assigned to the United States. *See* Tr. of Oral Argument at 18 ("There is no agreement that says no international service, period."). The only barrier to international DBS service is the Plan, which imposes a procedural constraint—not a legal one. As *DISCO I* made clear, a licensee seeking to provide international DBS service must obtain a modification of the Plan which, in turn, requires it to coordinate with other countries with Plan assignments that may be affected by the proposed modification. *See DISCO I*, 11 FCC Rcd at 2438, ¶ 57; 2439-40, ¶ 70. While a Plan modification may require a licensee to undergo a lengthy and uncertain process and perhaps accede to conditions imposed by foreign governments, the Plan itself does not, as the Commission argues here, pose an insurmountable procedural hurdle to the provision of international DBS service from the orbital locations assigned to the United States.

Third, and finally, the Commission has failed to adequately distinguish between NGSO FSS, which it treats as an international service, and DBS, which it treats as a "predominantly" domestic service. *Compare DBS Auction Order*, 19 FCC Rcd at 828, ¶ 16 (noting "many U.S.-licensed FSS satellites serve the international market"), *with id.* ("DBS service from the eight orbital locations assigned to the United States is predominantly domestic . . . ."). The Commission rejected Northpoint's argument that the ORBIT Act prohibits the auction of DBS service licenses because DBS shares spectrum with NGSO FSS, explaining that "[b]ecause NGSO FSS and DBS licenses are assigned entirely separately, there is no reason to read the ORBIT Act to constrain the DBS license assignments merely because NGSO FSS shares the same spectrum band." *DBS Auction Order*, 19 FCC Rcd at 832, ¶ 20. This construction may make sense in theory—although the statute speaks of spectrum, *not* licenses, *see* 47 U.S.C. § 765f ("*spectrum used for* the provision of international or global satellite communications services") (emphasis added)—but it

is premised on an insignificant distinction. No doubt there is a difference between NGSO FSS service and DBS service: DBS service depends on geostationary satellites—*i.e.*, ones that remain in fixed positions relative to the earth—while NGSO FSS service depends on *non*-geostationary ones—*i.e.*, satellite rings that continuously circle the earth.[5] But the fact that they use different technologies does not by itself support the Commission's labeling DBS service "domestic" and NGSO FSS service "international." *See DBS Auction Order*, 19 FCC Rcd at 831, ¶ 20. And against that one difference, we cannot help but note several important similarities. Not only do the two services share the same band of spectrum,[6] but, as *DISCO I* tells us, both have coverage areas that make international

---

[5] *See Amendment of Parts 2 & 25 of the Commission's Rules to Permit Operation of NGSO FSS Systems Co-Frequency with GSO & Terrestrial Systems in the Ku-Band Frequency Range*, First Report & Order & Further Notice of Proposed Rule Making, 16 FCC Rcd 4096, 4099 n.1 (2000) (*Co-Frequency Order*) ("NGSO systems are characterized by a constellation of satellites continuously orbiting the earth, rather than remaining stationary relative to an earth station as geostationary satellites do. A geostationary satellite orbits at about 35,900 km (about 22,300 miles) above the Earth in the plane of the Earth's equator. At this altitude above the equator, the satellite revolves around the Earth at a rate of speed synchronous with the Earth's rotation, so that the satellite stays above the same place on the Earth's equator.").

[6] *See Co-Frequency Order*, 16 FCC Rcd at 4160-61, ¶ 166 (2000) ("[W]e conclude that NGSO FSS operations can share this band with BSS operations on a co-primary basis under certain technical operating parameters . . . [and] are allocating the 12.2-12.7 GHz band to the fixed satellite service for use by non-geostationary orbit satellite downlink operations on a co-primary basis."); *compare also id.* at 4099, ¶ 2 ("[W]e allocate the 12.2-12.7 GHz band for NGSO FSS service downlinks on a primary basis."), *with id.* at 4101, ¶ 5 ("[T]he 12.2-12.7 GHz band is allocated to [DBS] on a primary basis.").

satellite communications service technically possible and both services' operators must obtain the authorization of foreign governments before providing international service. *See DISCO I*, 11 FCC Rcd at 2429, ¶¶ 1-2; 2432, ¶ 19; 2438-39, ¶ 57; 2438, ¶ 70; *see also Auction of Direct Broadcast Satellite Service Licenses Scheduled for August 6, 2003*, 18 FCC Rcd at 3479 n.8 ("The Region 2 Band Plan assignments for the United States include satellite beams or 'footprints' that . . . spill into Canada, Mexico, and the Caribbean . . . ."). The Commission adopted a policy of regulatory parity in *DISCO I*, that is, "a policy that permits all U.S.-licensed fixed satellite service ('FSS') systems . . . and direct-broadcast satellite service ('DBS') systems to offer both domestic and international services." *DISCO I*, 11 FCC Rcd at 2429, ¶ 1; *compare also id.* at 2437, ¶ 56 ("not[ing] that there might be specific considerations for [Mobile Satellite Service] and DBS that could dictate a different domestic/international policy"), *with id.* at 2440, ¶ 74 ("[W]e . . . allow all U.S.-licensed satellites in the fixed satellite service to provide both domestic and international services . . . [and] extend the benefits of this new policy to other services by permitting DBS satellites and geostationary MSS satellites to provide both domestic and international services."). In light of these similarities, the Commission's failure to identify a significant difference between NGSO FSS service and DBS service is especially glaring; accordingly, we cannot defer to the Commission's interpretation premised on such a difference unless the Commission adequately supports it.

## III.

While section 647 of the ORBIT ACT unambiguously forbids only the auctioning of orbital locations or spectrum used for "international or global satellite communications services," not domestic satellite communications services, the Commission's construction of the statute to exclude DBS from the auction

prohibition cannot withstand scrutiny at this point. Insofar as its construction is bottomed on a supposed substantive barrier imposed by the ITU Region 2 Band Plan, it is not reasonable. Since *DISCO I* the Commission has treated the Plan as a non-substantive barrier to international DBS service. Indeed, the Commission freely admits that it knows of no agreement or treaty prohibiting the provision of international DBS service by an FCC licensee. A statutory interpretation premised in part on either a non-existent factor or one that results from an unexplained departure from prior Commission policy and practice is not a reasonable one. Equally unreasonable is the Commission's use of an unidentified, but apparently crucial, difference between NGSO FFS service and DBS service to support its interpretation. There may be a key difference between the two but all the Commission has shown us are similarities. *Chevron*, however, does not allow for guesswork. Therefore, while the Commission's construction of section 647 of the ORBIT Act may not be prohibited by the statutory text (and may even represent a wise policy choice), it is an unreasonable construction on this record and the auction premised on it is unauthorized. Accordingly, we grant Northpoint's petition, vacate Part III.A of the *DBS Auction Order* and remand this matter to the Commission for further consideration consistent with this opinion.

*So ordered.*