**Cynthia A. HENRIQUEZ, Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of the Social Security Administration,[1] Defendant.**

**Civil Action No. 05–30289–KPN.**

United States District Court,
D. Massachusetts.

March 30, 2007.

1. Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is substituted for Jo Anne B. Barnhart as the defendant in this action pursuant to Fed. R.Civ.P. 25(d)(1).

Edward M. Pikula, O'Connor, Martinelli, Cullinan & Pikula, Springfield, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's, Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE OR REMAND and DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 7 and 10 )*

NEIMAN, Chief United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) which provide for judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner") regarding an individual's entitlement to Social Security Disability Insurance ("SSDI") benefits. Cynthia A. Henriquez ("Plaintiff") claims that the Commissioner's decision denying her such benefits— memorialized in a February 23, 2005 decision by an administrative law judge—is not supported by substantial evidence and is predicated on errors of law. Plaintiff has moved to reverse the decision or remand the matter for further review. The Commissioner, in turn, has moved to affirm.

The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73(b). For the reasons set forth below, Plaintiff's motion will be denied and the Commissioner's motion will be allowed.

## I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the

administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand[ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff, who was born on October 4, 1962, alleges disability due to headaches and depression as well as back, neck, shoulder and ankle pain. (Administrative Record ("A.R.") at 172, 183.) She has worked as a machinist and quality assurance technician, has recently earned an associates degree in civil engineering, and currently works as a project engineer. (A.R. at 33–34, 184, 189.)

### A. Medical History

Plaintiff's medical history is as follows. On January 15, 1998, Dr. R. Scott Cowan, an orthopedic surgeon, determined that Plaintiff had a herniated disk with neck and arm pain. (A.R. at 258–59.) He also noted that Plaintiff had previously undergone an anterior cervical diskectomy and fusion but determined that her prognosis was good. (*Id.*) At about the same time, Dr. Ronald Paasch, Plaintiff's treating physician, recommended physical therapy for Plaintiff's neck and scapular pain and

noted that she could perform clerical activities. (A.R. at 274.)

By May of 1998, physical therapy had improved Plaintiff's mobility. (A.R. at 273.) In addition, between June of 1998 and January of 1999, aggressive myotherapy and trigger point injections had reduced Plaintiff's back pain and headaches and increased her range of motion. (A.R. at 266–72.) By January of 2000, Plaintiff reported that her headaches were about "50% percent" better and she was tolerating her work activities "reasonably well." (A.R. at 264.) One year later, however, in her SSDI application (see *infra*), Plaintiff alleged that she became "disabled"—and hence unable to work—beginning on February 13, 2001. (See A.R. at 172–74.)

On August 7, 2001, Plaintiff was treated for neck pain as a result of a car accident; cervical spine x-rays showed no evidence of acute injury, but there were signs of instability. (A.R. at 280–84.) Later in August, Plaintiff was diagnosed with cervical, thoracic and lumbar strain, post-traumatic cephalgia and right shoulder sprain; over the next few months, however, therapy and treatment had improved Plaintiff's condition significantly. (A.R. at 276–86.)

Following the car accident, Dr. Anthony Kusiak oversaw Plaintiff's care through approximately September of 2002. (A.R. at 285–88.) In a letter to Plaintiff's attorney dated September 21, 2002, Dr. Kusiak opined that Plaintiff was "disabled from most occupations" between August 7 and November 13, 2001, "partially disabled" between November 14, 2001, and June 1, 2002, and "at risk of remaining partially disabled" after June 1, 2002. (A.R. at 287.)

In some contrast, Dr. William Straub, a state agency physician, stated on May 6, 2002, that, based on *his* review of the medical records, Plaintiff's exertional capacities were consistent with "light" work. (A.R. at 374–79.) He opined further that Plaintiff was limited only in her ability to perform overhead tasks. (*Id.*)

On May 17, 2002, Dr. Michael Bohnert completed a consultative psychiatric examination for the Massachusetts Rehabilitation Commission's Disability Determination Services ("DDS"). (See A.R. at 380–84.) He indicated therein that Plaintiff had finished her first semester of college, achieved "excellent grades," no longer took Klonopin, and experienced some moodiness and sadness. (*Id.*) He further noted that Plaintiff's activities included household chores, gardening, attending college, shopping, and socializing. (A.R. at 383.) Dr. Bohnert diagnosed an adjustment disorder with mixed emotional features, moderate, chronic, and secondary to pain. (A.R. at 384.)[2]

On October 9, 2002, Dr. Jose Azocar completed a consultative physical examination for DDS. (See A.R. at 400–03.) In his report, Dr. Azocar found no evidence of sensory or motor deficits; normal gait and deep tendon reflexes; occipital tenderness and limited range of motion of Plaintiff's neck and left ankle with flexion; normal strength; and no pain on straight leg raises. (See *id.*) He indicated that foot and ankle x-rays showed that Plaintiff suffered from diffuse osteopenia without significant abnormality, secondary osteoarthritic changes in her right ankle joints, and primary osteophytosis of her left ankle. (*Id.*) In Dr. Azocar's view, Plaintiff was limited

---

2. Similarly, on May 23, 2002, Dr. Celente Derecho, a state agency psychologist, stated that Plaintiff had a non-severe mental impairment resulting in mild difficulties in maintaining social interaction, concentration, persistence or pace. (A.R. at 385–98.) According to Dr. Derecho, Plaintiff could interact appropriately with others at work, follow instructions, and maintain an adequate work pace. (*Id.*)

only from repetitive neck bending and walking long distances. (A.R. at 403.)

On October 23, 2002, Dr. M. Douglass Poirier, a state agency physician who also reviewed Plaintiff's medical records, stated that she could: (1) lift and carry ten pounds frequently and twenty pounds occasionally; (2) stand and walk for at least two hours; and (3) sit for about six hours. (A.R. at 406–13.) Dr. Poirier also stated that Plaintiff could occasionally climb and crawl but could not use foot pedals or perform overhead work. (*Id.*)

According to records from the Pain Management Center at Baystate Medical Center ("PMC"), Plaintiff's headaches and back pain were relieved for four and one-half months from facet injections she received in December of 2002. (A.R. at 419.) In January of 2003, however, Plaintiff assessed her pain at a "4" (out of 10) at "best" and an "8" (out of 10) at "worst." (A.R. at 421.) Accordingly, a physician at the PMC recommended further pain management and a work hardening program. (*Id.*) Thereafter, in June of 2003, Plaintiff received additional injections which provided "excellent pain relief" for another four months. (A.R. at 417–19.)

Dr. Charles Weston, Plaintiff's primary care physician, completed a functional capacity assessment on February 17, 2004. (A.R. at 422–24.) Dr. Weston stated that Plaintiff could stand for six hours in an eight-hour workday, walk one hundred yards, occasionally lift fifteen pounds, sit for one hour at a time, and sit for six hours total in an eight-hour workday. (A.R. at 423.) He opined, however, that Plaintiff could not engage in frequent lifting and was "not likely" able to work more than six hours a day. (*Id.*) Dr. Weston's opinions were "mostly" based on Plaintiff's statements which he considered "reasonable" based on the medical evidence. (A.R. at 423–24.) Dr. Weston repeated these opinions in a second assessment dated December 1, 2004, but added therein that Plaintiff could only stand between one and two hours. (A.R. at 447–48.)

### B. *Procedural History*

On March 13, 2002, in the midst of these medical developments, Plaintiff applied for SSDI benefits alleging, as indicated, disability as of February 13, 2001. (A.R. at 172–74.) Plaintiff's application was denied initially and on reconsideration, whereupon she filed a request for a hearing. (A.R. at 123–25, 130–35.)

At a March 5, 2004 hearing, Plaintiff testified that she had been attending college full-time with classes five days a week. (A.R. at 59–62.) Plaintiff further testified that, in the 2003 spring semester, she tutored students for up to twenty-four hours a week but did not continue thereafter due to her heavy course load (A.R.61–62.) While in school, Plaintiff continued, she took Tylenol with codeine twice a day for pain. (A.R. at 63.) She also testified that she could stand for two hours, walk for an hour on a flat surface, and sit for an hour at a time. (A.R. at 66–68.) According to Plaintiff, reading and other activities aggravated her head and neck pain, causing daily headaches that were treated with injections. (*Id.*) Plaintiff further testified that she was fired from a job in January of 2001, because she could not physically perform the work and "exploded" at her boss, and that she thereafter received unemployment benefits. (A.R.70–72.)

A vocational expert also testified at the hearing. She opined that an individual of Plaintiff's age, education and work experience—who was limited to "sedentary" work with a sit/stand option, no frequent lifting, occasional lifting of up to fifteen pounds, no repetitive movement of the neck and head or need to hold the neck in one position for more than five minutes—could work as a civil engineering techni-

cian, receptionist or general office clerk. (A.R. at 44–47.) Were the ability to do keyboarding eliminated from the equation, the expert continued, the number of receptionist positions would be reduced by twenty-five percent and the number of office clerk positions by fifty percent. (A.R. at 47.) Were there additional limitations with regard to simple, rote tasks and occasional interactions with supervisors, co-workers and the public, the expert concluded, the receptionist jobs would be eliminated and the number of available office clerk positions reduced further. (*Id.*)

Based in large measure on the vocational expert's testimony, the administrative law judge (hereinafter "the ALJ") denied Plaintiff benefits in a decision dated May 27, 2004. (A.R. at 109–18.) On September 17, 2004, however, the Appeals Council remanded the matter for a second hearing. (A.R. at 119–21.) The Appeals Council directed the ALJ to (1) further evaluate Plaintiff's subjective complaints, (2) give further consideration to her residual functional capacity and, if warranted, (3) obtain supplemental evidence from the vocational expert, including answers to hypothetical questions that "reflect[ed] the specific capacity/limitations established by the record as a whole." (A.R. at 20–21.)

The second administrative hearing was held on January 18, 2005. Plaintiff testified that she received her college degree in May of 2004 and started full-time work in October of 2004 as a project engineer. (A.R. at 33–34.) According to Plaintiff, however, her new employer made "accommodations" for her disability. (A.R. at 34–35.) Plaintiff further testified that her condition had worsened since the last hearing and that she had mild headaches daily and immobilizing headaches monthly for several days at a time. (A.R. at 39–40.) She also testified that she had learned to deal with her headaches and had not missed any days from work. (A.R. at 35, 39–40.)

A different vocational expert, David Soja ("Soja"), testified at the second hearing. He identified several jobs that an individual of Plaintiff's age, education and work experience could perform—a tutor, dispatcher, employment clerk, telephone solicitor, interviewer or cashier—assuming, *inter alia,* a capacity to perform "sedentary" work with a "sit/stand option" and "limited neck mobility." (A.R. at 85–87.) Soja opined, however, that such an individual could not perform Plaintiff's past work. (A.R. at 85.) Moreover, Soja testified, if the individual were limited to a low-stress environment without strict production quotas, the available work would be reduced by seventy-five percent. (A.R. at 87–88.) With an additional limitation of only occasional interaction with supervisors, co-workers and the public, Soja opined that the individual could work as a surveillance system monitor. (A.R. at 88–90.) In answer to an inquiry by Plaintiff's attorney, Soja testified that the only way Plaintiff would be limited to *part-time* work would be if she was limited to working six hours a day as suggested by Dr. Weston. (A.R. at 94.)

In a decision dated February 23, 2005, the ALJ again found that Plaintiff was not disabled and, thus, not entitled to SSDI benefits. (A.R. at 14–27.) The Appeals Council thereafter denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (A.R. at 6–8.)

### III. DISCUSSION

An individual is entitled to SSDI benefits if, among other things, she has an insured status and, prior to the expiration of that status, was under a disability. *See* 42 U.S.C. § 423(a)(1)(A) and (D). Plaintiff's insured status is not challenged.

### A. Disability Standard and the ALJ's Decision

An individual is considered disabled if she is unable to participate in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled only if her physical or mental impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. 42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows a five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If [s]he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If [s]he does not have an impairment of at least this degree of severity, [s]he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1, Subpart P, Regulation No. 4. If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth, . . . does the claimant's impairment prevent [her] from performing work of the sort [s]he has done in the past? If not, [s]he is not disabled. If so, the agency asks the fifth question. Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so, [s]he is disabled; if not, [s]he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1 st Cir.1982).

In the instant case, the ALJ, upon remand, found as follows with respect to these questions: that Plaintiff had not engaged in substantial gainful activity from the alleged onset of her disability until October 4, 2004, when she returned to full-time work as a project engineer (question one); that Plaintiff has impairments that are "severe," but which do not meet or medically equal one of the listed impairments in Appendix 1 (questions two and three); that Plaintiff was unable to perform any of her past relevant work prior to October 2004 (question four); but that Plaintiff has the residual functional capacity to perform a significant range of sedentary work (question five). (A.R. at 25–26.) As a result, the ALJ concluded that Plaintiff was not eligible for SSDI benefits. (A.R. at 26–27.)

### B. Analysis of Plaintiff's Challenge to ALJ's Decision

Plaintiff, in essence, makes three arguments in support of her motion to reverse or remand, *i.e.,* that the ALJ (1) failed to make specific findings as to whether there were any "closed period" of at least twelve months during which she qualified for SSDI benefits, (2) improperly considered her project engineer work which was being

performed under an "accommodated disability" provided by her employer, and (3) failed to consider that her current work was performed during a "trial work period." The court will consider each argument in turn.

### 1. *Closed Period*

▮ Plaintiff's "closed period" argument can be disposed of in fairly short order. Plaintiff's assertions to the contrary, the ALJ fully considered whether she was disabled for any "continuous period of not less than 12 months" (*see* 42 U.S.C. § 1382c(a)(3)(A)) over the entire time-frame at issue. (A.R. at 17.) The ALJ found that Plaintiff was: "capable of performing a significant range of sedentary work ... *at all times* since her alleged onset of disability"; capable of performing other work in the national economy "*at all times* since her alleged onset of disability"; and, therefore, not disabled "*at any time* through the date of this decision." (A.R. at 24–25 (emphasis added).) Conversely, Plaintiff does not point to any twelve-month period during which the ALJ's findings are unsupported by substantial evidence. If anything, the evidence of record points in the opposite direction.

First, while Plaintiff alleges that her "disability" began on February 13, 2001, she testified that, when she left work the month before, she applied for and obtained unemployment benefits and certified that she was "ready, willing and able to work." (A.R. at 71.) Moreover, when asked if she was truthful in certifying her ability to work, Plaintiff testified as follows: "[w]hatever I can do to accommodate my neck. That's the only way I can work." (A.R. at 72.) The court also notes that Plaintiff took computer classes during this

time-frame and that, on August 29, 2001, Dr. Paasch, Plaintiff's treating physician, recommended vocational retraining. (A.R. at 261.) Such evidence is "clearly inconsistent" with Plaintiff's allegation of complete disability. *See Barrett v. Shalala,* 38 F.3d 1019, 1024 (8th Cir.1994).[3]

Second, while Plaintiff's injuries from a car accident in August of 2001 may have "disabled" her in the opinion of Dr. Kusiak, he limited that opinion to only a three-month period: August 7, 2001, through November 13, 2001. (See A.R. at 287.) Dr. Kusiak did not preclude all types of work for the subsequent six and one-half months (November 14, 2001, through June 1, 2002); rather, he stated that Plaintiff was only "partially disabled" during that time period and "at risk of remaining partially disabled" thereafter. (*Id.*) It is also undisputed that Plaintiff's condition improved with therapy and treatment over the next several months. (A.R. at 280–87.)

Third, other evidence is similarly unsupportive of Plaintiff's argument. In the spring of 2002, for example, Plaintiff was attending college for civil engineering with a "full-time" load of twelve credit hours. (See Document No. 11 ("Commissioner's Brief") at 18 n. 9 (noting that twelve credit hours equals a "full" load).) In September of 2002, Plaintiff continued to attend college full-time—taking math, design, drawing, and computer courses—and, when not in class, ran errands, shopped, and did homework and housework. (A.R. at 220–22, 383.) Thereafter, between January and May of 2003, in addition to being a full-time student, Plaintiff tutored students for up to twenty-four hours per week (A.R. at 61), and, by December of 2003, Plaintiff reported "excellent pain relief" from the

---

**3.** To be sure, Plaintiff allegedly stopped working from a particular job in January of 2001 because that position required repetitive upper extremity activities and caused neck pain.

(A.R. at 261.) The ALJ's subsequent analysis, however, adequately accounted for Plaintiff's neck condition. (See A.R. at 23, 26 at Finding 6. See also discussion, *infra*.)

injections provided by Dr. Viera (A.R. at 417).

Plaintiff continued full-time college work in the spring of 2004, carrying eighteen credit hours and attending classes five days per week. (A.R. at 59.) She also did homework, performed household chores and ran errands. (A.R. at 59–61.) Moreover, as described, Dr. Weston opined at the time that Plaintiff could stand and sit for six hours each in an eight hour day and could occasionally lift fifteen pounds. (A.R. at 447–48.) These limitations, as it turns out, are consistent with the ALJ's residual functional capacity findings. (See A.R. at 23.)

Granted, Dr. Weston also suggested that Plaintiff was "not likely" to be able to work more than six hours. (A.R. at 424; see also A.R. at 448 (Dr. Weston stating in December of 2004 that Plaintiff was "probably not able to work longer than 6 hours").) The ALJ, however, reasonably rejected this statement, tentative as it was, as inconsistent with the state agency opinions and the actual level of Plaintiff's activities. As noted, Dr. Weston's assessment was based "mostly" on Plaintiff's subjective statements (A.R. at 423, 448) and did not take into account the fact that Plaintiff was actually working and/or attending school full-time.

■ Before moving on, the court makes two comments related to several sub-arguments lurking in the "closed period" portion of Plaintiff's memorandum of law. First, Plaintiff's assertions to the contrary, the ALJ made an adequate credibility determination. As Plaintiff must *per force* concede, the Commissioner is responsible for weighing the evidence and resolving evidentiary conflicts. *See Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir.

2001); *Rodriguez*, 647 F.2d at 222. Here, the ALJ reasonably found that Plaintiff's activities—which included attending college, cooking, cleaning, gardening, tutoring and, later, full-time work—were inconsistent with her claim of disability, especially when considered in conjunction with the significant pain relief from treatment and the opinions of the medical sources. (A.R. at 23.) [4]

■ Second, Plaintiff implies that the ALJ failed to properly evaluate her pain pursuant to *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19 (1 st Cir.1986). The court disagrees. The essential purpose of an *Avery* analysis is to determine whether an administrative law judge properly assessed a claimant's subjective complaints of pain. Here, however, the ALJ assumed the validity of Plaintiff's subjective complaints. (See, *e.g.*, A.R. at 24 ("The record shows a persistent complaint of headache over an extended period of time for which numerous medications have been tried.") and 31 (summarizing Plaintiff's testimony regarding pain).) Thus, there was no need for the ALJ to undertake a formal *Avery* assessment. Even so, the ALJ: cited his obligation to "consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"; considered Plaintiff's medications; and took into account the impact of Plaintiff's pain on her daily life. (See generally A.R. at 17–27.) In short, there is nothing in Plaintiff's "closed period" argument—or the sub-arguments therein—warranting reversal or remand.

---

4. Granted, Plaintiff alleges that the ALJ should not have considered her college attendance when making this determination, yet she cites no relevant law to support this. Regardless, the additional evidence was more than sufficient to support the ALJ's credibility determination.

### 2. Accommodated Disability

Plaintiff also argues that the ALJ improperly considered her current, full-time work as a project engineer. More specifically, Plaintiff asserts, the ALJ failed to take into account that her employer has afforded her "accommodations" under the Americans with Disabilities Act ("ADA"), *e.g.*, the option of working at a drafting table—which allows her to "sit or stand" to do her work—and having other employees lift heavy drawings for her. (A.R. at 34–35.) This argument, creative as it is, misses the mark.

For one thing, the ALJ based his disability determination on the vocational expert's testimony about *other* jobs that Plaintiff could do. (See A.R. at 25–27, 85–94.) The ALJ made no assumption that her employer would accommodate her impairments. Accordingly, *Jones v. Apfel,* 174 F.3d 692 (5th Cir.1999), upon which Plaintiff relies, is distinguishable. *See id.* at 693 (expert's opinion that jobs permitted a sit/stand option did not suggest that employers would make an ADA accommodation, only that a sit/stand was prevalent in such jobs).

Plaintiff's reliance on *Eback v. Chater,* 94 F.3d 410 (8th Cir.1996), is similarly misplaced. In *Eback,* the court held that a vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employee to accommodate an individual's disability. *See id.* at 412. As indicated, however, the ALJ made no such assumption here. He simply considered the fact that Plaintiff could work full-time as essentially inconsistent with her allegation of complete disability, (see A.R. at 24–25), and then, as indicated, determined that there were *other* jobs Plaintiff could perform.

Moreover, Plaintiff's assertion that consideration of full-time employment creates a disincentive for individuals to seek accommodated employment is misplaced. The issue of "disincentives" simply has no bearing on whether this administrative law judge's decision is legally sound and based on substantial evidence. *See also Barnhart v. Walton,* 535 U.S. 212, 225, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (noting that while the Social Security Act "does not demand that the Agency make of this desirable end [(returning to work)] an overriding interpretive principle, the Agency has recognized and addressed the problem of work disincentives in other ways") (citing 20 C.F.R. §§ 404.1574(c), 404.1575(d)).

Further, and perhaps most importantly, the ALJ's assessment of Plaintiff's physical capacity for "sedentary" work (A.R. at 26) was more conservative than Plaintiff's actual job, which is characterized as "light" work, (*see* U.S. Dep't of Labor, *Dictionary of Occupational Titles* 20 (4th ed.1991) (available on Westlaw at DICOT 005.261–014)). In short, there is nothing in Plaintiff's accommodated disability argument which warrants reversal or remand.

### 3. Trial Work Period

Finally, Plaintiff argues—again creatively—that the ALJ should have treated her job as a "trial work period." That argument, however, reflects a misunderstanding of the trial work rules.

As the Commissioner notes, a trial work period is a period of up to nine months during which a disabled individual may work without loss of benefits. *See* 42 U.S.C. § 422(c). However, in order to be eligible for a trial work period, an individual must have been found disabled under the Act and receiving disability insurance benefits at the time. *See id.* (trial work period is "with respect to an individual entitled to benefits"); 20 C.F.R. § 404.1592(d)(1) (2007) ("You are generally entitled to a trial work period if you are entitled to disability insurance benefits ...

based on disability."); Social Security Ruling 82–52 (denying claims when the return to substantial gainful activity occurs before an award of benefits). *See also Wyatt v. Barnhart,* 349 F.3d 983, 985 (7th Cir.2003) ("Wyatt would not have been entitled to participate in trial work because he returned to work before receiving a formal determination of disability."); *Mullis v. Bowen,* 861 F.2d 991, 993 (6th Cir.1988) ("a 'trial work period' only applies after a person has been adjudged disabled"); *Conley v. Bowen,* 859 F.2d 261, 262 (2nd Cir.1988) (the Act "permits recipients of disability insurance benefits to retain their disabled status while they test their ability to work during a nine-month 'trial work period' "); *Van Buskirk v. Shalala,* 842 F.Supp. 1477, 1478 n. 2 (D.Mass.1994) ("As incentive for *disability beneficiaries* to return to work, they are allowed a nine month trial work period.") (emphasis added). Since Plaintiff has never been found disabled, the trial work rules simply do not apply.

 Plaintiff's reliance on a purportedly contrary opinion from the Eighth Circuit, *Newton v. Chater,* 92 F.3d 688 (8th Cir.1996), is unpersuasive. First, of course, this court is not bound by the holding of another circuit. *See United States v. Mitchell,* 432 F.2d 354, 356 (1st Cir.1970). Second, as articulated in the Commissioner's Brief, the continued viability of *Newton,* even in the Eighth Circuit, is questionable in light of the Supreme Court's decision in *Walton,* which noted that, under the regulations, a claimant is " '*not entitled* to a trial work period' if '[she] perform[s] work ... with 12 months of the onset of the impairment(s) ... *and before* the date of *any* notice of determination or *decision finding* ... *[her]* ... disabled.' " *Id.,* 535 U.S. at 223, 122 S.Ct. 1265 (emphasis in original). *See also Lichtenstein v. Barnhart,* 2006 WL 1554630, at *6 n. 6 (D.Me. June 1, 2006) ("While *Walton* did not overrule *Newton* it calls into question the validity of the Newton court's

approach....") Third, and more to the point, the ALJ here followed the well-established rules and regulations regarding trial work in reaching his decision. *See Nash v. Bowen,* 869 F.2d 675, 680 (2nd Cir.1989) (noting that "[a]n ALJ is a creature of statute and, as such, is subordinate to the [Commissioner] in matters of policy and interpretation of law") (citations omitted).

## IV. CONCLUSION

For the reasons stated, Plaintiff's motion to reverse or remand is DENIED and the Commissioner's motion to affirm is ALLOWED. This case may now be closed.

IT IS SO ORDERED.

